UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FREDERICK PEOPLES,

        Plaintiff,

vs.

FCA US, LLC,

        Defendant.

_____/

Case No. 15-14003
Hon. Mark A. Goldsmith

## OPINION & ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 37) AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Dkt. 38)

This is a disability discrimination, retaliation, and hostile work environment case brought under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 et seq., and Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"), Mich. Comp. Laws § 37.1101 et seq.. Plaintiff also alleges negligent infliction of emotional distress under Michigan law. For the reasons set forth below, Defendant's motion for summary judgment (Dkt. 37) is granted, and Plaintiff's cross-motion for summary judgment (Dkt. 38) is denied.

## I. BACKGROUND

In 2011, Plaintiff Frederick Peoples began working for Defendant FCA US, LLC ("Chrysler") in the chassis department of the Sterling Heights Assembly Plant ("SHAP") in Sterling Heights, Michigan. See Pl. Statement of Material Facts ("SMF") ¶ 1, Pl. Br. at 7. In August 2011, Peoples complained to his superiors that the rotation schedule was not being

observed, and management agreed. Id. ¶¶ 3-4.[1]  According to Peoples, this complaint led to a confrontation with a coworker on August 15, 2011. Id. ¶ 6.  Peoples claims that the co-worker initiated the confrontation. See Pl. Dep. Tr. at 25:7-9 (Dkt. 37-2).  Chrysler investigated the incident, and no one was disciplined. See Def. SMF ¶ 3.

Due to a back injury, Peoples missed work from October 14, 2011 to January 4, 2012. Id. ¶ 4.  Peoples then worked for two weeks, disagreed that his new duties complied with his new restrictions, and went back on approved medical leave from January 18, 2012, through April 9, 2012. Id. ¶ 5.

On May 7, 2012, Peoples was involved in another interpersonal confrontation, again based upon rotation schedules. Id. ¶ 6.  Peoples claims that his co-workers were the aggressors. See Pl. Resp. at 8 (Dkt. 42) (citing Pl. Dep. Tr. at 119-121).  This confrontation led to Peoples being taken to the plant medical office. Id.  Subsequently, Peoples's physicians diagnosed him with post-traumatic stress disorder. See Pl. SMF ¶ 64 (citing 7/10/2012 Diagnosis, Ex. L to Pl. Mot. (Dkt. 39-12)).  On the basis of this diagnosis, Peoples did not return to work until February 18, 2013. Id. ¶ 70; Def. SMF ¶ 8.[2]

On June 18, 2012, Peoples filed an EEOC charge in connection with the August 2011 and May 2012 disputes, alleging race and disability discrimination, as well as retaliation. See Def.

---

[1] Rotations are employed to prevent one part of an employee's body from becoming damaged by too much of the same repetitive motion. See, e.g., Pl. SMF ¶ 19.  Without additional evidence demonstrating that demands for a rotation schedule "were meant or treated as a request for an accommodation under the ADA," courts should not interpret such demands as requests for accommodation. See Brown v. Chase Brass & Copper Co., 14 F. App'x 482, 487 (6th Cir. 2001).

[2] Peoples's Statement of Material Facts ¶ 70, which asserts that he returned to work on February 8, contains no citation to the record.  Defendant's Statement of Material Facts ¶ 8, on the other hand, cites to a Notice of Reinstatement dated February 18, 2013, which sets forth a "RTW" date, or return-to-work date, of February 18, 2013. See 2/18/2013 Notice of Reinstatement, Ex N to Def. Mot. (Dkt. 37-15).

SMF ¶ 25; <u>see also</u> 2012 EEOC Charge, Ex. Z to Def. Mot. (Dkt. 37-27).   Peoples thereafter received a Right to Sue letter dated February 19, 2013.  Def. SMF ¶ 25; <u>see also</u> 2/19/2013 Right to Sue Letter, Ex. AA to Def. Mot. (Dkt. 37-28).  He had 90 days to file suit from that point, <u>see</u> 2/19/2013 Right to Sue Letter, but he did not file within that timeframe.

While Plaintiff was on leave from May 2012 to February 2013, he was sent for an independent medical examination ("IME") by Sedgwick, the company responsible for overseeing disability and medical leave requests for Chrysler.  Def. SMF ¶ 11.  The IME report recommended that Peoples be granted an accommodation in the form of "permanent transfer to a different Chrysler plant" other than SHAP.  <u>Id.</u>; <u>see also</u> Wolf IME, Ex. L to Def. Mot. (Dkt. 37-13).  In a letter dated January 15, 2013, Chrysler offered Peoples two reassignment options:  (i) the "paint shop," which was still on the SHAP campus, but in a separate building; or (ii) the Warren truck assembly plant.  <u>See</u> Def. SMF ¶ 12; <u>see also</u> 1/15/2013 Letter, Ex. M to Def. Mot. (Dkt. 37-14).  Peoples selected the paint shop position.  Def. SMF ¶ 13 (citing 2/6/2013 Letter, Ex. G to Def. Mot. (Dkt. 37-8)).[3]

When Peoples returned to work on February 18, 2013, he reported to the paint shop.  <u>Id.</u> ¶ 13.  He was again injured on March 9, 2013, allegedly due to Chrysler's rotation violations, necessitating more leave time.  <u>Id.</u> ¶ 14; Pl. SMF ¶ 73.

While on this stretch of medical leave, Peoples contends that he was sent for another IME on February 4, 2014, this time to address his mental health.  <u>See</u> Pl. SMF ¶¶ 73-77.  He returned

---

[3] Peoples claims that he contested the paint shop position due to its proximity to the facility where his antagonistic co-workers worked, as well as the IME's recommendation that he be moved outside of SHAP entirely.  <u>See</u> Pl. SMF ¶ 68.  However, to prove that he contested the assignment, he cites only an unsworn letter he sent to Chrysler dated October 17, 2012, <u>id.</u> (citing 10/17/2012 Letter, Ex. F to Pl. Mot. (Dkt. 39-6)), which predates the January 15, 2013 letter provided by Chrysler in which it offered Peoples a choice to work somewhere other than the SHAP campus (i.e., the Warren plant).  And Peoples's response to Chrysler's motion makes no attempt to rebut their claim that he was provided with a choice to work elsewhere.

to work in March 2014.  Def. SMF ¶ 15.  He was again injured on July 2, 2014, and he went on medical leave.  Id. ¶ 16.

Peoples returned to work on October 14 or 15, 2014.  Id. ¶ 17 (October 15); Pl. SMF ¶ 78 (October 14).  For four days, Peoples trained on a stationary car door to learn the position of paint seal operator, after which, on October 21, 2014, he was directed to perform his tasks on the assembly line.  Def. SMF ¶ 17.  In uncertain terms, Peoples claims that this work violated his medical restrictions and that he told Chrysler so.  See Pl. Resp. at 9 (citing Pl. Dep. Tr. at 178-183).  The plant doctor, however, had determined that the job did not violate Peoples's restrictions.  See Devine Dep. Tr., Ex. K to Pl. Mot., at 125:9-15 (Dkt. 39-11) ("Dr. McCormick determined that the operation did not violate his restrictions . . . .").[4]  Peoples could not keep up with the line's pace, the line had to be shut down, and he was disciplined via written warning.  Def. SMF ¶ 17; Pl. SMF ¶ 81.

The next day, on October 22, 2014, Peoples went to the plant medical office to complain that he was physically unable to perform the functions of a paint seal operator.  Def. SMF ¶¶ 19-20.  When a doctor was not immediately available, Peoples called himself an ambulance.  Id.; Pl. SMF ¶ 83.  That trip to the hospital resulted in a note excusing Peoples from work for October 22-23.  Def. SMF ¶ 19; Pl. SMF ¶ 84.  Also on October 22, 2014, after Peoples left work, the plant medical doctor, Peoples's supervisor, plant HR staff, and UAW representatives visited

---

[4] Plaintiff cites to the deposition testimony of Bradley Devine, a labor relations supervisor at SHAP, for the proposition that the work "was outside his medical restrictions."  Pl. Resp. at 9 (citing Devine Dep. Tr., Ex. L to Pl. Resp., at 124-125, 127 (Dkt. 42-12)).  That testimony, however, establishes only that Peoples was not "medically cleared" to work for a period of time — not because the work was outside of his restrictions, but because the plant medical office lacked the required documentation to reinstate him.  See, e.g., Devine Dep. Tr. at 126:5-10 ("A. But the paperwork that he came back from the hospital with did not provide enough detail for Medical to allow him to return to work, so he was — Q. Why did he need paperwork to return back to work?  A. Because Medical ultimately determines if somebody is fit to work.").

Peoples's work station to evaluate whether a paint seal operator could perform his assigned tasks within Peoples's bending and lifting restrictions; the plant doctor determined that he could do so. Def. SMF ¶ 20.

On October 24, 2014, Peoples was sent a "5-day letter," stating that he had been off work since "July 2, 2014" [sic];[5] it stated that Peoples's absence "was established for a certain period, but has not been currently justified" and asked him to report to SHAP's HR office by October 31, 2014, "unless on or before this date the Plant Employment Office receives satisfactory evidence as to the reason for your absence." Id. ¶ 21; Pl. SMF ¶ 85. The letter warned that failure to provide satisfactory documentation excusing the absence could result in termination of seniority. See 10/24/2014 Letter, Ex. W to Def. Mot. (Dkt. 37-24).

On October 29, 2014, in response to the 5-day letter, Peoples went to HR, which directed him to the plant medical office to be cleared to work. Def. SMF ¶ 22. Peoples claims that he gave documentation to the plant medical office that excused him from work from October 23 through February of 2015, but, in support of this fact, he cites only to an illegible copy of the doctor's note he claims to have submitted. See Pl. SMF ¶¶ 86, 89 (citing identical Exs. *I* & N to Pl. Mot. (Dkts. 39-9, 39-14). Peoples did not wait to see a doctor as Chrysler directed he do; rather, he went home and did not return. See Def. SMF ¶ 22; Pl. SMF ¶¶ 90-91. On November 13, 2014, after Peoples had been absent from work for two weeks, Chrysler terminated his employment. Def. SMF ¶ 24; Pl. SMF ¶ 92. "[Chrysler]'s reason for termination was Plaintiff's failure to properly comply with the 10/24/2014 5-day letter, and for not being medically cleared

---

[5] Chrysler admits that the July 2, 2014 date was an error, but it claims that it had no effect on the discharge decision. See Def. Mot. at 8 n.3. Elsewhere, it refers to the 5-day letter as having been issued on October 24, 2014. See Def. SMF ¶ 24. In any case, the parties do not dispute that (i) a 5-day letter was appropriate, given Peoples's single unexcused absence on October 24; nor that (ii) Peoples's October 29 visit to the plant medical office was timely under the terms of the 5-day letter.

to return to work."  Def. SMF ¶ 24; <u>see also</u> Termination Letter, Ex. X to Def. Mot. ("[Y]our employment will be terminated due to not following the reinstatement procedure.") (Dkt. 37-25); Def. Resp. to 11/20/2014 Termination Grievance, Ex. Y to Def. Mot. (stating in response to union grievance that Peoples was terminated because he "did not follow through on 5 Day letter request and substantiate absences[.]  Also not following management instructions.") (Dkt. 37-26).

After his termination, Peoples filed a second EEOC charge, dated February 26, 2015, alleging disability discrimination and retaliation beginning on October 22, 2014.  <u>See</u> EEOC Charge, Ex. BB to Def. Mot. (Dkt. 37-29).  The EEOC dismissed the 2015 charge and issued a right-to-sue letter on August 13, 2015.  <u>See</u> 8/13/2015 Letter, Ex. CC to Def. Mot. (Dkt. 37-30). Peoples filed his complaint on November 14, 2015 (Dkt. 1).

## II.  STANDARD OF DECISION

On a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## III.  DISCUSSION

### A. Plaintiff's Proffered Record Evidence

Much of Peoples's version of the facts is "supported" only by unsworn letters he claims he provided to Chrysler contemporaneously with the events underlying this case.  <u>See, e.g.</u>, Pl.

SMF ¶ 2 (citing 8/16/2011 Letter, Ex. A to Pl. Mot. (Dkt. 39-1)).[6]  Chrysler takes special issue with this, including in its response a "Rule 56(c)(2) Objection" that highlights the letters' character as unsworn hearsay.  See Def. Resp. to Pl. Mot. at 2 (Dkt. 41).  Chrysler also lists each paragraph of Peoples's Statement of Material Facts that contains no citation to the record whatsoever.  See id.

Peoples, in his reply brief, attempts to retroactively attach "id." citations to the factual assertions having no citation to the record.  See Pl. Reply at 1 (Dkt. 47).[7]  The Court declines to constructively amend Peoples's brief in this way.[8]  He also claims that his letters fall under three hearsay exceptions:  (i) admissions of a party-opponent; (ii) "evidence of Defendant's knowledge, because Plaintiff sent the letters to Defendant to put Defendant on notice regarding his experience at FCA"; and (iii) to demonstrate Chrysler's knowledge of Peoples's complaints "when it made decisions concerning whether it provided Plaintiff with an accommodation and knowledge that its employees had a pattern of retaliating" against Peoples for requesting

---

[6] Plaintiff sent the letters to management in order to memorialize events, including interpersonal conflicts and injuries that he claims affected him.  The letters also opine as to the causes of these events and the motivations of his colleagues.

[7] "Id." refers to the immediately preceding authority.

[8] Even if the Court was inclined to permit this type of amendment, attaching "id." citations in the manner that Peoples suggests would result in nonsense citations.  There are paragraphs that obviously would not be attributable to the preceding citation if an "id." was attached.  For example, in Pl. SMF ¶ 78, Peoples cites to a record of his technical work restrictions; but the next four paragraphs, which lack citations to the record, describe events occurring at his workplace.  Plainly, the list of work restrictions noted in Pl. SMF ¶ 78 does not support these subsequent assertions.  And Peoples's Statement of Material Facts already is riddled with other obvious "id." errors, such as the attribution of several events to a medical diagnosis certificate that contains no reference to the asserted events, see Pl. SMF ¶¶ 64-67.  Accordingly, the Court declines to attribute Peoples's unsupported factual assertions to the immediately preceding authorities.

accommodations.  Id.  No cases are cited, and Peoples only makes a blanket reference to Federal Rule of Evidence 801.  Id.

None of these hearsay exceptions applies.  First, the party-opponent admission exception does not apply, because Peoples is not his own opponent; he cannot invoke Federal Rule of Evidence 801(d)(2) to admit his own statements.  Second, Peoples's arguments that the letters are evidence of Chrysler's "knowledge," and therefore fall outside of the hearsay rule, requires that they were not offered for the truth of the matter asserted in the letters.  Accordingly, these unsworn letters will not be considered as evidence of the facts and events that they describe.

Peoples's final attempt to admit the contents of the letters is his claim that the letters "have subsequently been corroborated by Mark Taylor, Plaintiff's Union Representative."  Pl. Reply at 3 (citing Aikens Aff., Ex. M to Pl. Reply (Dkt. 47-13)).  The cited exhibit, however, proves no such thing.  It neither references Peoples's letters nor refers to any events contained therein, other than oblique references to the fact that Peoples was terminated.  Furthermore, the beliefs of Mr. Taylor, which are offered via Plaintiff's counsel's recollection of their conversation, appear to be hearsay.

Accordingly, this Court declines to consider the inadmissible evidence that Peoples offered in support of his version of certain facts, and it declines to consider any factual assertions for which Peoples did not provide a citation to the record.  See Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

## B.  Discrimination Claims

"The PWDCRA substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim."  Donald v. Sybra, Inc., 667 F.3d 757, 764 (6th Cir. 2012).  When neither party provides a reason to treat the ADA

and PWDCRA claims differently, courts tend to apply ADA jurisprudence.  See, e.g., id. ("[Plaintiff] provides no argument as to why we should treat the claims separately, nor does our review indicate as much.").  In the context of the disability discrimination claims, neither party provides an argument that the claims should be analyzed separately, and this Court will apply ADA jurisprudence to both claims.

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of a disability." 42 U.S.C. § 12112(a).  The statute defines "discriminate" to include "not making reasonable accommodation to the known physical . . . limitations of an otherwise qualified individual with a disability" unless the employer "can demonstrate that the accommodation would impose an undue hardship."  Id. § 12112(b)(5)(A).  To provide a reasonable accommodation, an employer may be required to modify the responsibilities of a disabled employee's existing job or transfer the employee to a vacant position with different responsibilities.  See 29 C.F.R. § 1630.2(o); Kleiber v. Honda of Am. Mfg., 485 F.3d 862, 870 (6th Cir. 2007).  If a plaintiff's requested accommodation is a transfer to a different position, "employers have a duty to locate [a] suitable position . . . ."  Kleiber, 485 F.3d at 870. "Nonetheless, to overcome summary judgment, the plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position." Id.

"To recover on a claim for discrimination under the ADA, a plaintiff must show that he or she (1) is disabled, (2) [is] otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability."  Ferrari v. Ford Motor Co., 826 F.3d 885, 891 (6th Cir. 2016) (citing Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1178 (6th Cir. 1996)).  "A plaintiff may do so by introducing direct evidence of discrimination, including evidence that the employer

relied upon the plaintiff's disability in making its employment decision, or by introducing indirect evidence of discrimination." Id. Chrysler argues that the indirect-evidence framework is sufficient to dispose of Peoples's claims, see Def. Br. at 12-13, and Peoples did not object or otherwise point to any direct evidence of discrimination, see generally Pl. Resp. See, e.g., Jenkins v. Plumbers & Pipefitters Union Local No. 614, 971 F. Supp. 2d 737, 745 (W.D. Tenn. 2013) ("Because [the plaintiff] does not allege direct evidence, the Court analyzes his objections under the McDonnell Douglas burden-shifting framework.").

The indirect method under the ADA adapts the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a Title VII case. Ferrari, 826 F.3d at 891. To proceed on a claim for disability discrimination under the indirect method, Peoples must first establish a prima facie case of discrimination by showing that (i) he is disabled; (ii) he is otherwise qualified for the position, with or without reasonable accommodation; (iii) he suffered an adverse employment decision; (iv) the employer knew or had reason to know of his disability; and (v) the position remained open while the employer sought other applicants or the disabled individual was replaced. Id. at 891-892.

### i. Prima Facie Case

Chrysler argues that Peoples's allegations and evidence cannot suffice to establish a prima facie case of disability discrimination under the ADA and the PWDCRA. Specifically, argues Chrysler, Peoples's decision to leave unexcused means that he is not "qualified," which is a necessary element of a prima facie case. See Def. Br. at 14 (citing Gantt v. Wilson Sporting Goods, 143 F.3d 1042 (6th Cir. 1998)).[9]

---

[9] Chrysler does not challenge any other elements of Peoples's prima facie case. See Pl. Br. at 14. Because of the conclusion reached below concerning pretext, however, it is immaterial whether Peoples established a prima facie case.

Peoples's absences, however, do not inform whether he was "qualified" as that term is used in the McDonnel Douglas burden-shifting framework.  A court "may not consider the employer's alleged non-discriminatory reasons for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the non-discriminatory reason was in actuality a pretext designed to mask discrimination." Hale v. ABF Freight Sys., Inc., 503 F. App'x 323, 333 (6th Cir. 2012).  "[T]he inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." Id.

Although Chrysler's cited case, Gantt, does state that "[a]n employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA," 143 F.3d at 1047, that case is distinguishable because of the nature of the Gantt plaintiff's absence.  She was not unqualified because of isolated or intermittent finite absences; rather, she was deemed unqualified because (i) her doctor had not released her to return to work; and (ii) after an entire year's absence, the plaintiff gave no indication whether she ever could return to work. Id.  Here, on the other hand, Peoples claims that he would have been able to return to work in roughly four months.

An unexcused failure to appear for work, however, does establish a legitimate, non-discriminatory reason for terminating an employee. See, e.g., Burdett-Foster v. Blue Cross Blue Shield of Mich., 574 F. App'x 672, 681 (6th Cir. 2014).  Here, Peoples had a note from his physician excusing him from work through October 23, and he did not show up for work on October 24.  Chrysler then gave Peoples a letter listing tasks he would have to perform in order

to keep his job, and Chrysler claims he did not perform them.  This suffices to shift the burden back to Peoples to show pretext.

### ii. Pretext

To prove pretext, a plaintiff must show "that the proffered reason either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action."  Id. (quoting Risch v. Royal Oak Police Dep't, 581 F.3d 383, 391 (6th Cir. 2009)).  "[The first and third] types of rebuttals are direct attacks on the credibility of the employer's proffered motivation for firing plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed 'a suspicion of mendacity.'"  Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-511 (1993)), overruled in part on other grounds by Geiger v. Tower Auto., 579 F.3d 614 (6th Cir. 2009).  "[S]uch a showing permits, but does not require, the factfinder to infer illegal discrimination from the plaintiff's prima facie case."  Id.  "[E]vidence within the first and third categories is 'easily recognizable.'"  Smith v. Hinkle Mfg., Inc., 36 F. App'x 825, 829 (6th Cir. 2002) (quoting Manzer, 29 F.3d at 1084).  Peoples does not identify which basis for proving pretext he is using, but his claim that he complied with the strictures of the 5-day letter invokes the third method of proving pretext.[10]

---

[10] Under the first method, "the plaintiff must present evidence that the proffered bases for discharge never happened."  Smith, 36 F. App'x at 829 (emphasis added).  Here, the parties are in agreement regarding what Peoples did in response to the 5-day letter.  Likewise, the second method does not apply.  Under that method,

> the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the

The third way of showing pretext — that the employer's proffered reasons were insufficient to motivate the termination — "<u>usually</u> consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in conduct substantially identical to that which the employer contends motivated its discharge of the plaintiff." <u>Smith</u>, 36 F. App'x at 829-830 (emphasis added) (quoting <u>Manzer</u>, 29 F.3d at 1084); <u>see also</u> <u>Hedrick v. W. Reserve Care Sys.</u>, 355 F.3d 444, 460 (6th Cir. 2004); <u>Johnson v. Kroger Co.</u>, 319 F.3d 858, 866 (6th Cir. 2003). Plaintiff points to no other Chrysler employee who was retained after failing to comply with a 5-day letter.

Although the third method of showing pretext "usually" requires a plaintiff to point to a similarly situated employee, that is not the only way of showing that the proffered reason was insufficient to motivate termination. "[F]or example, . . . the existence of clear language in an employee handbook stating that such conduct is perfectly acceptable in the workplace" might satisfy the third method. <u>Williams v. Tyco Elec. Corp.</u>, 161 F. App'x 526, 533 (6th Cir. 2006); <u>see also</u> <u>id.</u> at 533 n.4 ("[a] plaintiff is not required" to produce evidence of a similarly situated coworker).

Here, there was no "clear language" in an employee handbook ratifying Peoples's conduct. But there was the 5-day letter, which, if Peoples complied with its terms, would

---

<blockquote>
defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.
</blockquote>

<u>Manzer</u>, 29 F.3d at 1084 (emphases in original). Plaintiff does not admit that his conduct "could motivate dismissal." <u>See</u> <u>Williams v. Tyco Elec. Corp.</u>, 161 F. App'x 526, 533 n.4 (6th Cir. 2006) ("The difference between methods two and three is that in the second such, the plaintiff further admits that the facts could ordinarily provide sufficient grounds for the adverse action, while in the third, he argues that they could not.").

undermine Chrysler's justification of its decision to terminate Peoples. That 5-day letter directed Peoples, in pertinent part, to do the following:

> [Y]ou are to report to the Plant Employment Office on or before 10/31/2014, unless on or before this date the Plant Employment Office receives satisfactory evidence as to the reason for your absence. <u>If you do not report or submit such evidence</u> as directed above or if you do not promptly notify the Plant Employment Office that for a reason beyond your control, which you must satisfactorily substantiate, you were unable to comply with either of those instructions, your seniority will be terminated.

10/24/2014 Letter, Ex. W to Def. Mot. (emphasis added). Everyone agrees that, prior to October 31, 2014, Peoples did physically <u>appear</u> at the Plant Employment Office, but they disagree whether he left before the purpose of his appearance could be accomplished. Peoples claims that his appearance proves that he complied with the letter, making his termination unjustified. <u>See</u> Pl. Br. at 29; Pl. Resp. at 13-15.[11]

Peoples, therefore, must create a fact question as to whether he reported to the Plant Employment Office as requested. This he cannot do. Viewing the reporting requirement in context, the 5-day letter undoubtedly contemplates that the recipient physically appear at the Plant Employment Office, not just to show his face and prove that he still exists, but also to substantiate his absence. <u>See also</u> "Report," Oxford English Dictionary (3d ed. 2009) (defining "report" as "3c. intr. To compile, present, or submit a (formal) report on something investigated or assessed.").

---

[11] Peoples also claims that, during his brief visit to the Plant Employment Office, he provided documentation excusing his continued absence, thus fully satisfying the 5-day letter's requirements in an alternative way. <u>See</u> Pl. SMF ¶ 89 (citing Doctor's Note, Ex. *I* to Pl. Mot. (Dkt. 39-9). But as Chrysler points out, <u>see</u> Def. Resp. at 14, the illegible doctor's note offered in support has no bearing on (i) whether Peoples submitted the note to Chrysler or (ii) whether it was "satisfactory." Peoples, therefore, has not shown that he submitted the documentation that the 5-day letter demanded in lieu of his appearance.

Although a narrow, context-free reading of the 5-day letter's "reporting" requirement might yield a definition of the requirement that Peoples complied with, see, e.g., id. (defining "report" as "6a. trans. (refl.). To inform the relevant authority that one has arrived or is present in a certain place"), Peoples may not exploit any such potential ambiguity in order to create a fact question as to pretext.

In <u>Sybrandt v. Home Depot, U.S.A., Inc.</u>, 560 F.3d 553, 561 (6th Cir. 2009), for example, the employee disagreed with the defendant employer regarding the interpretation of a policy; predictably, under the employee's interpretation, her conduct had not violated the policy, but under the employer's "strict interpretation" of the policy, <u>id.</u> at 560, the employee's conduct warranted dismissal. The Sixth Circuit held that "the fact that there might be some ambiguity in [the employer]'s Code of Conduct does not suffice to create a genuine issue of material fact about whether [the employer]'s stated reason for terminating [the employee] was a pretext designed to mask . . . discrimination." <u>Id.</u> at 561; <u>see also</u> <u>id.</u> ("In sum, [the employee] argues against what she alleges is an overly strict interpretation of [the employer]'s "no-self-service" policy. But this is not enough under our precedents."). At summary judgment on a pretext inquiry, the burden is on the plaintiff to present evidence sufficient "to allow a reasonable jury to conclude that [the employer]'s policy decision was <u>so unreasonable as to be disbelieved</u>," and the plaintiff does not carry his burden when he presents "no evidence tending to show that [his] interpretation of the rule is superior" to that of the employer. <u>Id.</u> (emphasis added).

Like the plaintiff in <u>Sybrandt</u>, Peoples's argument that he complied with the policy articulated in the 5-day letter is not supported by evidence sufficient to create a fact question as to whether Chrysler acted so unreasonably, vis-à-vis its own policy, as to be disbelieved. <u>See</u>

also id. ("[T]here is no evidence that [the employer]'s interpretation was objectively wrong or inconsistent with its prior practice.").

Similarly, in Marshall v. Belmont County Board of Commissioners, 110 F. Supp. 3d 780, 787 (S.D. Ohio 2015), aff'd, 634 F. App'x 574 (6th Cir. 2016), the plaintiff's supervisor recommended to the decision-makers that plaintiff be terminated due, in part, to "insubordinate" behavior. The plaintiff argued, in part, that her behavior did not fit within the definition of "insubordinate" found in the employee handbook and that, therefore, the given reasons for her termination were insufficient to justify it — relieving her of the usual burden to point to a similarly situated coworker. Id. at 800. Agreeing that it should eschew an overly formalistic approach to the third Manzer method of showing pretext, the court nevertheless rejected the plaintiff's argument, reasoning as follows:

> Even assuming that the Plaintiff's arguments are correct as a matter of fact, the Court does not believe they support an inference of pretext in this case. Nothing in the record suggests that the Defendant Commissioners relied on the formal definitions of "discipline" . . . in terminating the Plaintiff's employment. Instead, the record demonstrates that Defendants employed those terms in a colloquial fashion, consistent with their common usage.

Id.[12] Marshall thus holds that if the employer's interpretation of its policy is a reasonable one, the existence of another, technically correct interpretation of a policy does not create a fact question as to an inference of pretext.

Peoples further alleges that one of his supervisors, Brad Devine, "testified that he did not even know what other information would have been required" before the meeting at the Employment Office would have been deemed complete. See Pl. Resp. at 14 (citing Devine Dep.

_____

[12] Notably, the Sixth Circuit affirmed, stating that "We have independently reviewed the record in detail, and have carefully considered the briefs submitted by the parties. [W]e detect no error in the district court's detailed analysis." 634 F. App'x at 575.

Tr. at 42:21-25, Ex. L to Pl. Resp. (Dkt. 42-12)).  The cited portion of Devine's testimony, however, does not support Peoples's contention that the meeting initiated by a 5-day letter has no defined procedures or requirements, let alone that it is sufficient to simply show up and leave. Rather, Devine acknowledged that an employee who believes that they are entitled to restrictions must complete a process in which the plant medical office determines whether the employee needs restrictions; Devine then conceded that he didn't "know all the ins and outs of how they determine when restrictions are required and when they aren't."  Devine Dep. Tr. at 42:20-25. Devine's lack of familiarity with how the plant medical office makes its medical determinations does not create a genuine issue of material fact as to whether Peoples, by refusing to stay at the plant medical office until he could be seen, complied with the 5-day letter.

At this point in the burden-shifting framework, the burden rests squarely on Peoples "to produce sufficient evidence from which a reasonable jury could infer that the defendant's legitimate, non-discriminatory reason is pretextual."  Williams, 161 F. App'x at 533.  In the hypothetical example of a "clear language in an employee handbook stating that such conduct is perfectly acceptable in the workplace," the plaintiff survives summary judgment by reference to the handbook provision's clarity and force.  Here, it is not at all "clear" that Peoples's conduct was sufficient to comply with the 5-day letter's requirement.  In fact, context and common sense support Chrysler's interpretation.  Simply pointing to the letter's "report" language does not create an issue of fact.  A plaintiff's preferred interpretation of an ambiguous policy is not enough to show that the employer lacked an honestly held belief in its nondiscriminatory reason. See, e.g., Sybrandt, 560 F.3d at 561.

Because Peoples cannot show a genuine issue of material fact as to pretext, Chrysler is entitled to summary judgment on Peoples's discrimination claims under the ADA and PWDCRA.

### C.  Retaliation Claims

Peoples's complaint sheds very little light on the bases for his retaliation claims. Regarding the ADA, Peoples alleges that Chrysler's adverse employment actions — "including but not limited to terminating Plaintiff[ ]" — were "in retaliation for threatening to file a claim of discrimination and opposing Defendant's unlawful acts." <u>See</u> Compl. ¶ 40.  Regarding the PWDCRA, Peoples claimed that he was terminated "in retaliation for opposing Defendants' violations of the [PWDCRA]." <u>Id.</u> ¶ 46.  And, regarding both the PWDCRA and Title VII, Peoples claims that "Defendant's conduct as alleged above constitutes retaliation against the Plaintiff because he engaged in activities protected by Title VII and the [PWDCRA]. The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's retaliatory animus." <u>Id.</u> ¶ 48.

Peoples's response to Chrysler's motion adds some much-needed specificity:  the protected activity on which he bases his retaliation claims occurred in October and November 2014, when he protested that the paint seal operator job was not within his medical restrictions; and the retaliatory actions included disciplining Peoples for refusing to perform the paint seal operator job and terminating him. <u>See</u> Pl. Resp. at 16.

Regarding Title VII, Chrysler argues that Peoples's complaint "failed to identify" facts in support of a retaliation claim under that statute. <u>See</u> Def. Br. at 15-16.  Indeed, Title VII exists to remedy discrimination on the basis of an individual's "race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a).  Title VII also has an anti-retaliation provision, which provides

that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice <u>made an unlawful employment practice by this subchapter</u> . . . ."  42 U.S.C.A. § 2000e-3 (emphasis added); <u>cf.</u> <u>Clark v. City of Dublin, Ohio</u>, 178 F. App'x 522, 524 (6th Cir. 2006) ("Title VII does not cover age or disability discrimination claims.  The appropriate remedy for . . . disability discrimination claims comes from the . . . ADA . . . .").  None of Peoples's filings, including his complaint, identifies any fact that could support a retaliation claim under Title VII when the core of his claims relate only to disability.  And, at the hearing on the instant motions, Plaintiff's counsel was unable to explain how any of Peoples's claims — which, with the exception of negligent infliction of emotional distress, are entirely based on Peoples's disability — are cognizable under Title VII.  Accordingly, the Title VII retaliation claim is dismissed with prejudice.

The plaintiff bears the initial burden to establish a prima facie case of retaliation under the ADA, "which requires a showing that (1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action.  Establishing a prima facie case of retaliation is a low hurdle."  <u>Rorrer v. City of Stow</u>, 743 F.3d 1025, 1046 (6th Cir. 2014).  "[T]o establish a retaliation claim the plaintiff need not prove he had a disability . . . .  Rather, the protected act is the showing of a good-faith request for reasonable accommodations."  <u>Baker v. Windsor Republic Doors</u>, 414 F. App'x 764, 777 n.8 (6th Cir. 2011) (citing <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 502 (3d Cir. 1997)).

To prove the causal-connection element of a prima facie retaliation claim, "a plaintiff must 'establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.'"  <u>E.E.O.C. v. Ford Motor Co.</u>, 782 F.3d 753, 770 (6th Cir. 2015) (ADA)

(quoting <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 133 S.Ct. 2517, 2533 (2013) (Title VII)). Traditionally, it has been held that, without more direct or circumstantial evidence, temporal proximity alone may establish a prima facie case only if the temporal proximity is "very close." <u>Barrett v. Lucent Techs., Inc.</u>, 36 F. App'x 835, 843 (6th Cir. 2002) (quoting <u>Clark Cnty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001)).

Peoples presents no direct evidence of a causal connection between the protected activity and the adverse employment actions. Peoples, however, was disciplined for his refusal to perform the paint seal operator job contemporaneously with his alleged protestations that he could not do the job, making the temporal proximity between any requested accommodation and the disciplinary action very close indeed. <u>See, e.g.</u>, <u>Mickey v. Zeidler Tool & Die Co.</u>, 516 F.3d 516, 525 (6th Cir. 2008) (lay-off occurring on same day that employer learned of plaintiff's EEOC charge was one of "limited number of cases" in which court "can infer a causal connection between the two actions, even if [plaintiff] had not presented other evidence of retaliation"). And not a month passed between the October 21, 2014 protected activity and Peoples's November 13, 2014 termination. The Court, therefore, assumes without deciding that Peoples has cleared this "low hurdle" and established a prima facie case.[13]

---

[13] This Court assumes <u>dubitante</u> the continued viability of the close-temporal-proximity doctrine in light of the Supreme Court's decision in <u>Nassar</u>. To wit, in <u>Nassar</u>, the Supreme Court opined in dicta that, under the "lessened causation standard" that it was rejecting, an employee could exploit knowledge of an impending adverse employment action by engaging in protected activity and then crying "retaliation" when the adverse employment action immediately came to pass. <u>See</u> 133 S. Ct. at 2532. In <u>Yazdian v. ConMed Endoscopic Techs., Inc.</u>, 793 F.3d 634, 650 (6th Cir. 2015), the employer invoked this discussion in <u>Nassar</u>, raising the issue whether very close temporal proximity still suffices to establish causation in the context of a prima facie case of retaliation. The Sixth Circuit reaffirmed that close temporal proximity was relevant to causation, however, because the plaintiff before it had produced some evidence that the plaintiff's protected activity was not undertaken to generate a retaliation claim, but instead had also been undertaken previously. <u>See</u> <u>id.</u> The same is true here; the record reflects that Peoples has engaged in protected activity prior to that which immediately preceded his discipline and termination

After a plaintiff establishes a prima facie retaliation claim, the remainder of the McDonnell-Douglas burden-shifting analysis applies. See Rorrer, 743 F.3d at 1046. Peoples's claim fails, however, because he does not present evidence to rebut Chrysler's legitimate, non-discriminatory reason for its adverse employment actions, thereby creating a fact question as to pretext. To demonstrate pretext in this context, "a plaintiff must show both that the employer's proffered reason was not the real reason for its action, and that the employer's real reason was unlawful." Ford Motor Co., 782 F.3d at 767 (emphasis in original). "To avoid summary judgment, then, the [plaintiff] must present evidence from which a reasonable jury could find that poor performance was not the real reason that [the defendant] terminated [the plaintiff], and that unlawful retaliation in fact was." Id.

The only evidence Peoples offered to establish his prima facie case of retaliation was temporal proximity. But, at the pretext stage, "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 317 (6th Cir. 2001); see also Ford Motor Co., 782 F.3d at 767 ("[T]emporal proximity cannot be the sole basis for finding pretext." (quoting Donald v. Sybra, Inc., 667 F.3d 757, 763 (6th Cir. 2012)); Pettit v. Steppingstone, Ctr. for the Potentially Gifted, 429 F. App'x 524, 535, 536 (6th Cir. 2011) ("[E]vidence of causal connection at the prima facie stage is often probative of pretext also . . . . However, that evidence may be insufficient, standing alone, to raise a genuine issue as to pretext. . . . Temporal proximity is insufficient to carry this burden."). Because Peoples offers

---

(including, but not limited to, the 2012 EEOC charge). The Court need not resolve this issue, however, because its resolution does not affect the ultimate conclusion that Peoples cannot create a fact question whether Chrysler's explanations for its actions were pretextual.

no other admissible evidence to rebut Chrysler's explanation for its decisions, summary judgment is appropriate.

Moreover, apart from his physical restrictions, Peoples admitted that he had no idea how to perform the Paint Shop job, <u>see</u> Pl. Dep. Tr. at 184:2-7 (recounting statement to supervisor that "I do not know the job, Amen.  I cannot bend to complete the job, Amen.  And if you put me on the line is gonna go down, because everyone over here knows I don't know this job."), and he maintained — falsely — that he had not been trained for it, <u>id.</u> at 183:1-17, 184:2-11 (admitting that he had been practicing on a "dummy door" for four days but asserting that this was not training).[14]  Peoples's own testimony, therefore, establishes that there was an independently sufficient cause for his discipline:  the fact that he lacked the <u>knowledge</u>, not just the physical ability, to do his job when management had deemed his training sufficient.  Plaintiff even recounts predicting that the assembly line would have to be shut down "because" he did not know how to perform the job.  <u>Id.</u> at 184:2-7.

_____

[14] To the extent that Peoples wished to argue that the lack of training <u>itself</u> was part of Chrysler's retaliatory scheme (i.e., to set him up for failure so that it could discipline him), this argument fails.  The complaint certainly offers no hint as to this theory, as the complaint entirely fails to mention anything about the October 2014 discipline, let alone its context.  Likewise, Peoples's Counter-Statement of Material Facts eschews this theory, instead attributing the assembly-line stoppage solely to his medical restrictions.  <u>See</u> Pl. Resp. at 9; <u>see also id.</u> at 18.  The only place that this argument appears is in the 2015 EEOC charge, which stated that "I was disciplined due to my inability to do a job that I was placed on without adequate training to perform because of my work restrictions due to my disability."  2015 EEOC Charge (Dkt. 37-29); <u>see also id.</u> ("I believe that I was being retaliated against by being disciplined without training . . . .").

Notwithstanding whether Peoples forfeited this theory, the argument fails on the briefs submitted.  Chrysler cited to admissible evidence showing that (i) Peoples trained for this position for four days; and (ii) employees typically learn this task in one to two days.  <u>See</u> Def. SMF ¶ 17.  Peoples cites no evidence in rebuttal, and, in reviewing Peoples's deposition testimony, the Court only discovered his conclusory testimony reflecting his belief that the training he received was not, in fact, training.  <u>See</u> Pl. Dep. Tr. at 183:1-17, 184:2-11.  Accordingly, there is no question of material fact whether Peoples was adequately trained.

Accordingly, no reasonable jury could find that performance was not the real reason for disciplining Peoples. And, even absent the evidence of Peoples's performance issues, Peoples did not carry his burden to rebut Chrysler's legitimate, non-discriminatory reasons for disciplining and terminating him. Furthermore, the reasons given for termination (i.e., failure to attend work and failure to comply with the 5-day letter) were wholly unrelated to the assembly-line shutdown and subsequent discipline. There is no indication in the record that the written warning issued to Peoples played a role in the issuance of the 5-day letter or Peoples's termination, and Peoples points to no other evidence tending to connect the termination decision — the true adverse employment action[15] — to a retaliatory motive. All of Peoples's testimony in support of his retaliation claim amounts to a mere guess that Chrysler acted unlawfully. See generally Pl. Dep. Tr. at 176-184. Accordingly, Peoples cannot rebut Chrysler's reasons for disciplining and terminating him, and Chrysler is entitled to summary judgment on Peoples's retaliation claims.[16]

### D. "Interactive Process" Claim

While attempting to rebut Chrysler's retaliation arguments, Peoples argued that Chrysler failed in its duty to engage in an "informal, interactive process with the employee" to properly

---

[15] In the ADA context, "[d]iscipline can constitute an adverse employment action if it is a materially adverse change in the terms and conditions of [plaintiff's] employment" or "when disciplinary write-ups affect an employee's opportunity for promotion and pay raises, and may place an employee on probation." Rose v. Buckeye Telesystem, Inc., 181 F. Supp. 2d 772, 776 (N.D. Ohio 2001) (citing Hollins v. Atl. Co., 188 F.3d 652, 662 (6th Cir. 1999); Cunningham v. Kansas City Star Co., 995 F.Supp. 1010, 1025 (W.D.Mo.1998); Duran v. N.M. Dep't of Labor, 143 F.Supp.2d 1278, 1285 (D.N.M. 2001)). Peoples does not explain why the written warning he received on October 21, 2014, rises to the level of an adverse employment action.

[16] Chrysler also advanced the separate argument that, unlike under the ADA, a request for an accommodation is not a protected activity under the PWDCRA against which an employer can retaliate. See Def. Br. at 17 n.8. Because Chrysler is entitled to summary judgment on the PWDCRA claims for the same reasons that it is entitled to summary judgment on the ADA and Title VII claims, the Court declines to reach this argument.

apply an accommodation.  See Pl. Resp. at 18 (citing Kleiber v. Honda of Am. Mfg., 485 F.3d 862, 868 (6th Cir. 2007)).  The purpose of the interactive process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  Kleiber, 485 F.3d at 871.  "Although mandatory, failure to engage in the interactive process is only an independent violation of the ADA if the plaintiff establishes a prima facie showing that he proposed a reasonable accommodation."  Rorrer, 743 F.3d at 1041 (emphasis added); see also Keith v. Cnty. of Oakland, 703 F.3d 918, 923 (6th Cir. 2013) ("individualized inquiry" is "threshold matter," discussed prior to the "otherwise qualified" element of a prima facie case).  "[T]he interactive process is mandatory, and both parties have a duty to participate in good faith."  Kleiber, 485 F.3d at 871 (emphasis added).  "If this process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown."  Id.

The totality of the October and November 2014 events establishes that Chrysler made an effort to engage in the interactive process and that Peoples was the cause of its breakdown. Chrysler submitted evidence of its understanding, measured at the time that Peoples first reported to the paint shop, that the paint seal operator job was within Peoples's restrictions.  See Devine Dep. Tr., Ex. T to Def. Mot., at 94:25-95:5 (paint seal operator job "fit the restrictions that Mr. Peoples had when he reinstated").  Peoples testified that he requested an accommodation, which he claims was "supported by medical evidence."  Pl. Resp. at 9, 18 (citing Pl. Dep. Tr. at 178-183).  Peoples's cited testimony, however, only shows that, days later, when it came time to move from the practice area to the assembly line, he claimed that (i) he could not bend to do the job; but, in any case, (ii) he had no idea how to do the job.  See Pl. Dep. Tr. at 183.  Plaintiff does not rebut Defendant's evidence that the job was already certified to be within his

restrictions; Plaintiff at no point provides any "medical evidence" that the job was <u>not</u> within his restrictions, <u>see</u> Pl. Dep. Tr. at 182:7-15 (admitting that it had not been medically determined that he could not do the paint seal operator job); and Plaintiff has not shown that he requested, let alone proposed, any accommodation.

Moreover, after Peoples left the paint shop, he acknowledges that Chrysler did re-examine whether the job was within his restrictions. <u>See</u> Pl. Dep. Tr. at 181:8-24; <u>see also</u> <u>Kleiber</u>, 485 F.3d at 872 (employer visit to plaintiff's work station on production line "to try and identify appropriate jobs" for plaintiff undercut plaintiff's accusation of employer's bad-faith participation in interactive process). The only reason this examination did not become "interactive" was Peoples's abrupt departure and his failure to complete a visit required by his 5-day letter. <u>See also</u> Devine Dep. Tr., Ex. T to Def. Mot., at 125:9-12 ("A. The walk-through was scheduled before the ambulance incident. Q. Was [Peoples] supposed to be there at the walk-through? A. Yes.").

In conclusion, Peoples's interactive-process claim is no defense to summary judgment for three reasons, each of which are independently fatal to the claim: (i) Peoples never identified an interactive-process claim in his complaint; (ii) he did not propose a reasonable accommodation, <u>see</u> <u>Rorrer</u>, 743 F.3d at 1041; and (iii) Peoples himself caused the breakdown of an interactive process.

### E.  Hostile Work Environment Claims

In Count VI, Peoples claims that he was subjected to a "hostile and abusive working environment in violation of Title VII and the PWDCRA." Compl. ¶ 50.

#### i.  Title VII hostile work environment claim

Chrysler argues that Title VII claims, in particular, must be included in an EEOC charge and described with particularity. Def. Br. at 18-19 (citing <u>Younnis v. Pinnacle Airlines, Inc.</u>, 610 F.3d 359, 361 (6th Cir. 2010)). Here, Peoples's 2015 EEOC charge — which he filed after he was terminated — did not mention anything about a hostile work environment or Title VII; it simply noted a previous charge that was brought, in part, under Title VII, and it did not indicate anything related to a hostile work environment. <u>Id.</u> at 19. Further, nothing in the 2015 Charge would lead the EEOC to expand its investigation to include such a claim. <u>Id.</u>

Peoples responds that his 2015 EEOC charge is sufficient, claiming that he "incorporated, by reference, as shorthand to those events, the facts from his 2012 EEOC charge, where he alleged [a] hostile working environment based on his disability amongst other things." Pl. Resp. at 19. Plaintiff further argues that, under <u>National Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002), a court may consider acts outside of the statutory limitations period if a series of acts creating a hostile work environment, which collectively constitute one unlawful employment practice, continued into the limitations period. <u>See</u> Pl. Resp. at 20.

Chrysler is correct; Peoples failed to exhaust his administrative remedies with respect to a Title VII hostile work environment claim. "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge." <u>Younis</u>, 610 F.3d at 361; <u>see also id.</u> at 362 ("The problem in this case is that in his EEOC filing, [Plaintiff] did not allege a claim of hostile work environment, and he cited only discrete acts of alleged discrimination."). That said, courts may consider claims that are reasonably related to, or grow out of, the factual allegations in the EEOC charge. <u>See</u> <u>Randolph v. Ohio Dep't of Youth Servs.</u>, 453 F.3d 724, 732 (6th Cir. 2006). As a result, "whe[n] facts related with respect to the charged claim would

prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." Davis v. Sodexho, 157 F.3d 460, 463 (6th Cir. 1998).

The narrative portion of Peoples's 2015 EEOC charge states, in full:

> In June 2010, I began employment with the above-named employer and was last employed as an Assembler. I am an individual covered under the [ADA].
>
> In June 2012, I filed an EEOC Charge, . . . based on T-7 [i.e., Title VII], and the ADA.
>
> On or about October 22, 2014, I was disciplined due to my inability to do a job that I was placed on without adequate training to perform because of my work restrictions due to my disability. On October 22, 2014 thru February 2, 2015, my physician placed me on a medical leave due to my disability. On or about November 25, 2015 [sic; 2014], I received communication from my benefits office, indicating that I was terminated on November 7, 2014. Therefore, I am discharged without benefits.
>
> I believe that I was retaliated against by being disciplined without training, denied a reasonable accommodation, and discharged due to my disability, in violation of Title I of the [ADA], as amended.

See 2015 EEOC Charge. The charge claims that the offending conduct took place starting on October 22, 2014, at the "earliest." Id.

Peoples's 2015 EEOC charge is explicitly founded upon a discrete event that occurred "[o]n or about October 22, 2014," and no earlier. "[T]he inclusion in an EEOC charge of a discrete act or acts, standing alone, is insufficient to establish a hostile-work-environment claim for purposes of exhaustion unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge." Younis, 610 F.3d at 362. Although it mentions the 2012 EEOC charge, the 2015 charge does not purport to "incorporate" the allegations made therein; even assuming that a thorough investigation of the 2015 charge would cause the investigator to review the 2012 charge, the 2015 charge lacks a single indication that the two are related. Indeed, unlike the 2012 charge, the 2015 charge does not even invoke Title VII. The discussion

of the 2014 events does not imply, even weakly, that those events are part of a pattern stretching back to 2012.

Furthermore, as noted above, Title VII exists to remedy discrimination on the basis of an individual's "race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a). Hostile work environment claims premised upon the plaintiff's disability may be brought under the ADA. See, e.g., Hardenburg v. Dunham's Athleisure Corp., 963 F. Supp. 2d 693, 707 (E.D. Mich. 2013); see also 162 A.L.R. Fed. 603 (identifying distinction between Title VII and ADA hostile work environment claims). This cements the Court's conclusion that the 2015 charge, which failed to tick the boxes for "race," "color," "religion," "sex," or "national origin," see 2015 EEOC Charge, stood no chance of alerting an investigator to a Title VII hostile work environment claim.

Finally, Peoples's citation to Morgan is misplaced. Morgan was not an exhaustion case. Rather, it had to do with whether a hostile work environment claim was timely: if a hostile work environment occurred over a time period spanning the beginning of the 300-day period covered by an EEOC charge under Title VII, a plaintiff potentially can recover for pre-limitations-period acts. See Morgan, 536 U.S. at 123 ("A charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."). Here, timeliness is not at issue. At issue is whether the 2015 EEOC contained sufficient information to put the EEOC on notice as to Peoples's hostile work environment claim. For the reasons stated above, it did not, and Morgan does not change this result.

The elements of a claim for hostile work environment under Michigan's PWDCRA are as follows: (i) the employee belonged to a protected group; (ii) the employee was subjected to communication or conduct on the basis of the protected status; (iii) the conduct was unwelcome; (iv) the unwelcome conduct or communication (a) was intended to or in fact did substantially interfere with the employee's employment or (b) created an intimidating, hostile, or offensive work environment; and (v) respondeat superior. Mazur v. Wal-Mart Stores, Inc., 250 F. Appx 120, 127-128 (6th Cir. 2007). "In order to establish a hostile work environment [under the PWDCRA], courts ask 'whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment.'" Id. (quoting Quinto v. Cross & Peters Co., 547 N.W.2d 314, 320 (Mich. 1996)). "Courts must examine the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. "[T]he issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether — taken together — the reported incidents make out such a case." Williams v. Gen. Motors Corp., 187 F.3d 553, 562 (6th Cir.1999). A court "borrows federal law to analyze a claim" of hostile work environment brought under the PWDCRA. Notarnicola v. Johnson Controls Inc., No. 12-11331, 2014 WL 1304591, at *8 (E.D. Mich. Mar. 28, 2014) (citing

---

[17] Although Count VI of the complaint alleges a hostile work environment under both the PWDCRA and Title VII, see Compl. ¶ 50, this portion of Chrysler's brief names only the PWDCRA and interchangeably cites federal and Michigan state authority. See Def. Br. at 19, 20-23. In its reply brief, Chrysler attempts to extend these arguments to Peoples's federal claims, but it identifies the ADA, not Title VII. See Def. Reply at 5 (Dkt. 44).

Smoyer v. Dep't of Corr., No. 223043, 2001 WL 1512064, at *6 (Mich. Ct. App. Nov. 27, 2001)).

Chrysler speculates as to which portions of Peoples's deposition might serve as evidence of a hostile work environment. See Def. Br. at 21. This includes (i) violations of his rotational rights under a collective bargaining agreement, Pl. Dep. Tr. at 171-173; (ii) being told by co-workers that he is not wanted on the team, or being told, "you don't have restrictions," id. at 106-107, 113; (iii) unjust discipline in violation of the collective bargaining agreement, id. at 172-173; (iv) threats to fire him, id. at 172; (v) inaction as to Peoples's complaints, id. at 173; and (vi) "forcing" Peoples to go to the plant medical office, id. at 109.

Peoples did not argue that Chrysler's list was incomplete. See Pl. Resp. at 21-22. In fact, Peoples's response defends his hostile work environment claim based upon even fewer events, limited to: (i) the 2011 and 2012 interpersonal altercations, id. at 22; (ii) placement at the paint shop "against the recommendation of [Chrysler's] own physician," id.; and (iii) the events surrounding the October 2014 assembly-line shutdown, id. ("Defendant forced Plaintiff to perform work outside of his medical restrictions and threatened to discipline him if he did not perform the task despite Plaintiff's protest that the task was not within his medical restrictions.").

Peoples fails to produce any admissible evidence supporting his claim that his placement at the paint shop contributed to a hostile work environment based on his disability. As noted above, see note 3, supra, Chrysler provided Peoples with a choice to work elsewhere, but he opted for the paint shop position. It was Peoples, not Chrysler, who rejected a reassignment that would have complied with the IME's recommendation that Peoples be assigned to a facility other than the SHAP campus.

Nor could the events surrounding the October 2014 assembly-line shutdown support a fact question as to a hostile work environment claim based on disability. In Michigan, comments offered in support of a hostile work environment claim must somehow relate to the plaintiff's protected status. See Corley v. Detroit Bd. of Educ., 681 N.W.2d 342, 346 (Mich. 2004) (hostile work environment claim based upon sexual harassment fails because "[v]erbal or physical conduct that is not sexual in nature is not sexual harassment"); Watz v. Wal-Mart Stores E., LP, No. 320883, 2015 WL 2329076, at *4 (Mich. Ct. App. May 14, 2015) ("[B]y analogy [to Corley], in order for plaintiff to establish a hostile work environment claim based on his disability, he was required to present evidence that the conduct and communications on which he relied to establish his claim pertained to his disability."), appeal denied, 871 N.W.2d 189 (Mich. 2015)). Peoples freely admitted that, in addition to his belief that the job did not comply with his unsubstantiated medical restrictions, he had no idea how to perform the job. See, e.g., Pl. Dep. Tr. at 184:2-7. Peoples's supervisors' comments, as Peoples recalls them, lack any indication that they were spurred by his disability and are entirely consistent with his lack of knowledge as to the job; neither the comments nor Chrysler's decision to discipline Peoples could support an inference that Peoples's disability was a factor in the disciplinary decision. See Pl. Dep. Tr. at 180:18-19 ("From what I recall, Amen said that, 'If you cannot do the job that I am requesting for you to do, you will be fired.'"); id. at 183:20-23 ("Amen came up to me and ordered me to get on [the assembly] line, which I had never been on [the assembly] line at that point. And he demanded that I do that job and know how to complete it . . . ."); id. at 184:2-7 ("He demanded that I do the job on [the assembly] line although I had never been trained on [the assembly] line to do the job.").

Having determined that neither the reassignment to the paint shop nor the October 2014 incident contribute any question of fact to Plaintiff's hostile work environment claim, the Court returns to the August 2011 and May 2012 assaults. Chrysler argues that claims based on these assaults are time-barred under the PWDCRA, because they predated the complaint by more than three years and "Michigan does not have a 'continuing violations' doctrine extending limitations periods." Def. Br. at 21 & n.11 (citing Garg v. Macomb Cnty. Cmty. Mental Health Servs., 696 N.W.2d 646 (Mich. 2005)). Although Chrysler is correct that Peoples may not recover damages attributable to pre-November 2012 conduct, such conduct may be considered as "background information" in evaluating whether Peoples has created a question of fact as to his hostile work environment claim. See Campbell v. Human Servs. Dep't, 780 N.W.2d 586, 592 (Mich. Ct. App. 2009). However, the paint shop reassignment and the October 2014 incident, considered in the aggregate, do not suggest that a fact question could exist as to a hostile work environment; the 2011 and 2012 assaults are "background" to nothing at all. And the fact that the assaults were temporally removed from the alleged hostile work environment reduces their value as background evidence. See, e.g., Barrett v. Whirlpool Corp., 556 F.3d 502, 519 (6th Cir. 2009) ("[W]hile it may be considered as 'background evidence,' it is too far removed in time from the other incidents alleged by [the plaintiff] to be part of 'the same actionable hostile work environment practice' at issue here.").

Finally, in addition to its unrebutted innocuous explanations for the alleged conduct underlying the hostile work environment claim, Chrysler argues, simply, that "[t]hese incidents do not rise to the level of objectively offensive, severe or pervasive communications based on Plaintiff's claimed disability." Def. Br. at 21. A plaintiff must create a fact question concerning whether the alleged abuse was "severe or pervasive enough to create an objectively hostile or

abusive work environment — an environment that a reasonable person would find hostile or abusive." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993). Summary judgment is appropriate only if the evidence is so one-sided that there is no genuine issue of material fact as to whether there was a hostile work environment. Abeita v. Transam. Mailings, Inc., 159 F.3d 246, 250 (6th Cir.1998).

Even if true, the proffered tableau of Chrysler's offenses — i.e., one instance of criticism and discipline (which, apparently, was justified, and, even if unjustified, cannot be described as severe, pervasive, hostile, or abusive) and Peoples's own choice to work at the paint shop instead of leaving the SHAP campus for a different position — would not, as a matter of law, permit any reasonable jury to find in favor of Peoples on his hostile work environment claim. "'Conversations between an employee and his superiors about his performance does not constitute harassment simply because they cause the employee distress,'" particularly when "[t]here is no evidence that [the plaintiff] was ridiculed or insulted because of his medical condition." Plautz v. Potter, 156 F. App'x 812, 819 (6th Cir. 2005) (quoting Keever v. City of Middletown, 145 F.3d 809, 813 (6th Cir. 1998)).

### F. Negligent Inflication of Emotional Distress

Finally, Chrysler seeks dismissal of Count VII, which claims that Chrysler's alleged conduct caused Peoples to suffer emotional and physical distress, see Compl. ¶¶ 51-55.

In Michigan, the Worker's Disability Compensation Act ("WDCA") is the exclusive remedy for any personal injury claim against one's employer. See Hesse v. Ashland Oil, Inc., 642 N.W.2d 330, 335 (Mich. 2002) ("[P]laintiffs' claim against [the employer] for negligent

infliction of emotional distress is barred by the exclusive remedy provision of the WDCA . . . .").[18]

Peoples's negligent infliction of emotional distress claim, therefore, is dismissed with prejudice.

### G. Plaintiff's Motion for Partial Summary Judgment

Peoples's motion for partial summary judgment (Dkt. 38) only sought judgment in his favor on Counts I and III (ADA discrimination and retaliation, respectively). The arguments and evidence cited in support of this motion were considered in the preceding analysis. Because Chrysler has shown that it is entitled to summary judgment on these two counts, Peoples's motion is denied as moot.

## IV. CONCLUSION

For the foregoing reasons, Defendant Chrysler's motion for summary judgment (Dkt. 37) is granted, and Plaintiff Peoples's motion for partial summary judgment (Dkt. 38) is denied. A separate judgment will enter.

SO ORDERED.

Dated:  May 24, 2017                                s/Mark A. Goldsmith
      Detroit, Michigan                          MARK A. GOLDSMITH
                                         United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 24, 2017.

                                        s/Karri Sandusky
                                        Case Manager

---

[18] Because the WDCA's exclusive remedy provision settles this issue, the Court takes no position on the parties' dispute whether this cause of action is only available to a plaintiff who witnessed an injury befall certain third persons, see Def. Br. at 24; Pl. Resp. at 23.